UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FRAZETTA PROPERTIES, LLC,

    *Plaintiffs,*

vs.                                                     CASE NO. 8:22-cv-00581-WFJ-AEP

VANGUARD PRODUCTIONS, LLC, and JESS DAVID SPURLOCK,

    *Defendants.*
_____/

## AFFIDAVIT OF LEIGH McMILLAN WILLIAMS

I, LEIGH MCMILLAN WILLIAMS, attorney for Defendants J. DAVID SPURLOCK and VANGUARD PRODUCTIONS, LLC ("VANGUARD"), do hereby depose and state as follows:

I have personal knowledge of the events and occurrences described in the following statements made in this affidavit, and I attest that they are true, complete, and correct:

    **A.**    **BACKGROUND - THE DARK HORSE LETTER**

1. On July 9, 2024, I filed Defendants' Renewed Motion for Reconsideration [DIN 176], citing the 2015 Letter [DIN 95-4] addressed to Frank Frazetta, Jr., Dark Horse Comics, and Diamond Comics Distributors (The "Dark Horse Letter"), attached to Mr. Spurlock's November 28, 2023 Affidavit [DIN 95], affirming that Defendants are authorized to reproduce Frazetta Properties, LLC's ("Frazetta Properties") copyrighted images authorized under the terms and provisions of the *Frazetta Trademark and Endorsement Agreement* [DIN 87-2, pp. 17-23], Part B of the 2010 Settlement Agreement [DIN 87-2] entered into between Frank Frazetta, David Spurlock, and Vanguard.

2. When I filed the Dark Horse Letter with the court [DIN 95-4], I believed the members of Frazetta Properties had signed the Letter.

3. When I filed Defendants' Objection to Frazetta Properties' Damages Brief [DIN 163], I believed the members of Frazetta Properties had signed the Letter.

4. When I filed Defendants' Rule 26 Disclosures [DIN 192] naming Frank Frazetta, Jr. as a witness to the Dark Horse Letter, I believed the members of Frazetta Properties had signed the Letter.

5. I had no reason to think the signatures had not been made by the members of Frazetta Properties. I represented David Spurlock and Vanguard in their counterclaims against Frank Frazetta in the 2010 litigation [DIN 87-1] in the Southern District of New York and assisted in negotiating the terms of the settlement agreement and its sub-parts with the attorneys for Frank Frazetta and the then-manager of Frazetta Properties.

6. I had no reason to think the signatures had not been made by the members of Frazetta Properties because David Spurlock and Vanguard's books have consistently reproduced copyrighted *Death Dealer* images in all of their Frazetta books – the 2008 and 2010 editions of *Frazetta Definitive Reference* (*Death Dealer, Death Dealer II, IV*, and *VI*); the 2020 edition of *Fantastic Paintings of Frazetta* (*Death Dealer,* 3 pages, 2 full pages); the 2014 edition of *Frazetta Sketchbook Volume II* (*Death Dealer, Death Dealer IV, Death Dealer V*).

7. I had no reason to think the signatures had not been made by the members of Frazetta Properties because Vanguard's authority to reproduce copyrighted Frazetta Properties images has been a pattern and practice of the parties since the parties 2010 Settlement Agreement, not limited to the publication of the *Frazetta Definitive Reference*.

### B. Jack Merritt's Accusation of Forged Signatures on the Dark Horse Letter

8. Jack Merritt, counsel for Frazetta Properties, did not dispute the signatures on the Dark Horse Letter until mediation was held on February 13, 2025. At the time, the issue came out of the blue – the time for discovery had just ended, and Frazetta Properties had not served any discovery on the Dark Horse Letter during discovery.

9. Taken by surprise, I replied that Defendants were aware of the Dark Horse Letter, as they were the ones who produced it to Frazetta Properties, who, in any event, had been in possession of the Dark Horse Letter since 2015.

10. Jack Merritt dropped the "bombshell" accusation of forgery of the Dark Horse Letter in a very dramatic manner to Magistrate Judge Porcelli at the hearing on Defendants' Motion to Compel on February 18, 2025.

11. Jack Merritt had never contacted me directly to speak with me about the signatures on the Dark Horse Letter at any time after the Dark Horse Letter [95-4] had been filed with the court on November 8, 2023. It was now February 18, 2025, and Jack Merritt was making his accusation to the Magistrate Judge, officially putting me and my client on notice that Frazetta Properties intended to raise the issue of the authenticity of the signatures before the court by some type of motion.

12. After the hearing, I advised David Spurlock that Frazetta Properties were accusing him of forgery and unethical behavior as to the Dark Horse Letter, specifically, that the members' signatures were forgeries and that David Spurlock not only knew of this, but had forged the signatures himself back in 2015.

13. I believed, and still believe, that Frazetta Properties knew of the Dark Horse Letter, had it in their possession since 2015, and that they had always acted in the knowledge that Vanguard was authorized to reproduce copyrighted Frazetta Properties images since at least 2010. However, the fact that they were now disputing the authenticity of the members' signatures required me to advise David Spurlock of the issue and advise him to conduct a search of his/Vanguard's records.

14. Jack Merritt did not advise that Frazetta Properties disputed sending the Dark Horse Letter to Frank Frazetta, Jr., so I asked David Spurlock to conduct a very thorough search of his documents, emails, texts, and the parties' social media posts to gather corroborating documents about the facts and circumstances of the Dark Horse Letter, including proof of Frazetta Properties sending the Dark Horse Letter to Diamond Comics Distributors, Dark Horse Comics, or Frank Frazetta, Jr.

15. I asked David Spurlock to conduct this search to inquire on two issues: (i) proof of the authenticity of the signatures on the Dark Horse Letter, and/or (ii) proof that Frazetta Properties sent the Dark Horse Letter or a letter substantively the same as the Dark Horse Letter to any of the addressees.

16. I did this in order to determine the course of action for David Spurlock and Vanguard to take concerning the accusation of forges signatures on the Dark Horse Letter.

17. As I viewed the situation at the time, depending on what information David Spurlock located, I had either of two options: (i) Possible correction or amendment of Defendants' Renewed Motion to Reconsider, or (ii) Acknowledging error to the court and moving to withdraw the Motion and for rescission of the Order partially granting it.

18. Because discovery period had already expired when Jack Merritt made the accusation of forgery, I was prevented from subpoenaing records from Frazetta Properties member Frank Frazetta, Jr. to ascertain whether Frazetta Properties sent him the Dark Horse Letter in 2015.

19. My search was thus limited to a review of the transcripts of depositions taken of Holly Frazetta, Joseph Weber, and David Spurlock, and the thousands of pages produced and gathered in the Sarasota Circuit Court case litigating Sub-Part A of the 2010 Settlement Agreement, for any relevant admissible evidence as to the Dark Horse Letter.

20. During the last week of February, I took my husband to the ER for a prolonged bout of severe dizziness and headache. He was hospitalized for three days, and I stayed with him the entire time[1]. Upon being released, I took him to follow up appointments at the VA clinic and cared for him until he recovered.

**C.    A Bit of Relevant Information About Me, My Home, and My Family**

21. The following section described my daily life in general, and my specific activities and use of time during the month of March, 2025:

22. My mother and father live with me and my husband, in preference to their living in an assisted living facility where they would lack privacy, independence, would be generally less happy, and the décor would make my mother miserable.

---

[1] My late sister Elizabeth, who lived in Easthampton, NY, was taken to ER in 2014, was admitted to hospital, and left alone for the night when her partner went home to sleep. Elizabeth died during the night, alone. My mother learned of Elizabeth's passing from an Eye Bank Association volunteer who called with condolences and to thank my mother for Elizabeth's donation of her corneas.

23. My father, George McMillan, 94-years old, is a 1954 graduate of West Point and flew jet fighters in the U.S. Air Force before becoming an analyst in AT&T's IT division (maths genius). He has severe memory loss, suffers from terminal cancer, is wheelchair bound, cannot sleep through the night, is in great pain, but was a high achiever in life with a strong will, and his disabilities frustrate him.

24. My mother, Pat Hart McMillan, is 92 years old, still authoring books on home decorating and is her husband's 24-hour caregiver. She is awakened several times each night by my father, in acute pain and in need of assistance.

25. My husband George Williams, 86 years-old, is a 70% disabled retired U.S. Army Aviator and Ranger (tab and scroll) who served with the 82nd and 173rd Airborne Divisions, deployed for two tours in Vietnam: 1966-67 as a Long Range Reconnaissance Patrol Leader (Delta Operations), and from1968-69 as a UH-1 pilot with the 135th Assault Helicopter Command[2]. In addition to suffering from a service-related career-ending ankle fracture, fused in 1983, he has suffered from severe dizziness, tinnitus, memory loss, and increased pain in his ankle and left knee for the past three years.

26. In addition to my growing practice, I am full-time housekeeper, prepare the meals, do the grocery shopping, laundry, and house cleaning for my family.

D.     THE INVESTIGATION OF THE DARK HORSE LETTER - MARCH 2025

27. During March, my 92-year-old mother suffered a stroke and was taken to the ER, where she remained for two days. While she was in hospital, I cared for my

---

[2] The *original* Death Dealers, George Williams' call sign was *Dealer Two-Zero*.

farther, which required my full-time attention because he cannot care for himself and awakens several times each night, requiring me to stay on the couch in his room.

28. After her release from hospital, my mother's caregiving load needed to be lightened, and I stepped up a bit. I also needed to accompany my husband to his several follow up appointments at the VA clinic, when he underwent an outpatient procedure, and traveled to Lubbock, Texas, to have his ankle seen by an orthopedic surgeon.

29. In late March, I called Jack Merritt about the attorney fees awarded to Defendants for their motion to compel production of a certified copy of the Application for *Death Dealer II*'s copyright registration. I spoke with Jack, who advised he hadn't read my letter yet, but would contact me later to discuss the fee amount. He rang off quickly without discussing the Dark Horse Letter.

30. At the end of March, the January 14, 2015 email to managing member William Frazetta attaching the Dark Horse Letter was located, and David Spurlock's message that he had placed the members' signatures on the Letter clearly showed that the signatures on it were admittedly placed there by David Spurlock as an expedient.

31. Although David Spurlock's message in the 2015 email demonstrated the absence of intent to commit forgery, it nonetheless required me to acknowledge my error with the court and withdraw the Dark Horse Letter and Defendants' Renewed Motion for Reconsideration.

32. I was in the process of advising David Spurlock of this and the need to draft and file the appropriate documents with the court, when on March 31, 2025, Frazetta Properties, with no advance notification of their intent, filed their Motion for Sanctions.

33. I was taken aback and felt extremely insulted by the motion's harsh and overly dramatic wording and shrill demand for punishment.

34. I reacted in anger, filing Defendants' Renewed Motion for Summary Judgment, requested an evidentiary hearing on the issues, and filed notice of Defendants' intent to subpoena Frank Frazetta, Jr.'s records on the Dark Horse Letter.

35. I calmed down, then called Jack Merritt on April 5th and apologized for my error. I advised him that I intended to withdraw the notice of intent to serve a subpoena for Frank Frazetta Jr.'s records, as David Spurlock had not located any document conclusively proving his understanding that Frazetta Properties sent the Dark Horse Letter to Frank Frazetta, Jr., thus a continued fight was not in the best interests of Vanguard and David Spurlock.

36. Frazetta Properties' motion contains the admission that they "*found the signatures to be familiar, researched the matter and compared signatures … and engaged an expert to exam (sic) the signatures …*" after the August 14, 2024 hearing on the Renewed Motion for Reconsideration. [DIN 218, ¶ 11]. This indicates to me that Frazetta Properties planned the Motion for Sanctions in the autumn of 2024.

37. After my April 5th telephone call with Jack Merritt to apologize for my error, and while drafting Defendants' Response to Frazetta Properties' motion for sanctions, it hit me that Jack Merritt always assumed that David Spurlock and I deliberately filed a forged document and continued to believe that David Spurlock and I had acted in bad faith.

38. In drafting my affidavit and Defendants' Response, it occurred to me that Jack Merritt (i) decided not to notify me of Frazetta Properties' dispute as to the Dark Horse Letter until mid-February 2025; (ii) decided not to notify me of Frazetta Properties' pursuit of a theory of forgery and fraud; (iii) decided not to notify me that Frazetta Properties drafted a motion for sanctions; and (iv) decided not to notify me that Frazetta Properties intended to forego serving a copy of the motion for sanctions to me in preference to filing it without notice on March 31, 2025.

39. It also occurred to me that Jack Merritt refrained from notifying me of the dispute until discovery expired, preventing me from serving discovery on Frank Frazetta, Jr. with respect to the Dark Horse Letter.

40. After I worked through my anger with Jack Merritt's conduct, I reflected on my conduct during the pendency of this litigation with respect to my relationship with Jack Merritt as opposing counsel. I thought I had acted with civility. For example, of the 29 times Frazetta Properties asked for enlargements of time, I made no objection, and I even filed a certificate of good faith conference [DIN 209] for Frazetta Properties when a motion was filed without the required certificate. [DIN 208].

41. David Spurlock has consistently demonstrated cooperation with efforts to resolve the issues, including his payment of the fee for certified copies of *Death Dealer V*'s Application and Application Template [DIN 173; 174; 193] assisting Frazetta Properties compliance with the court's order. [DIN 166].

*Frazetta Properties, LLC v. Vanguard Productions, LLC & Spurlock*
Case No. 8:22-cv-00581-WFJ-AEP

42. My failure to discuss my progress with Jack Merritt during March is a lapse I regret, as Jack Merritt apparently assumed that I was ignoring the accusations, rattling his cage,[3] or stalling for time to fabricate bogus evidence to support the Dark Horse Letter.

43. However, March was a very taxing month for me – in addition to the family medical emergencies, I also added three new clients that month, one of whom had a claim that was about to expire, and I took my husband back to the ER on April 13 at 2:00 PM, and stayed with him until he was released at 11:00 PM and I drove him home.

44. I regret my error in submitting the Renewed Motion for Reconsideration. It was my mistake, and David Spurlock did nothing to deserve Frazetta Properties' furious accusations of forgery and fraud.

45. I apologize to Frazetta Properties' members, and I again apologize to Jack for my errors, my failure to contact him in March, and for my many shortcomings in failing to adequately and timely respond to Frazetta Properties' accusations of forgery before the Motion for sanctions was filed.

46. Lastly, I apologize to the court because my failures to Frazetta Properties and Jack Merritt caused Frazetta Properties to file their Motion for Sanctions, which demand for the court's intervention now requires the court's time and attention.

47. I ask that the court not find David Spurlock at fault for forgery, fraud, or any unethical act. He has conducted himself in an entirely blameless fashion and I alone am responsible for drafting and filing Defendants' Renewed Motion for Reconsideration.

---

[3] NASCAR term for when a driver bumps another driver's vehicle from behind to startle or upset him; not illegal, just good ol' boys, never meanin' no harm …

*Frazetta Properties, LLC v. Vanguard Productions, LLC & Spurlock*
*Case No. 8:22-cv-00581-WFJ-AEP*

PURSUANT TO 28 U.S. CODE § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT I HAVE READ THE ABOVE STATEMENTS, AND THAT THE FOREGOING ARE TRUE AND CORRECT.

DATED: APRIL 14, 2025

/s/: _____
LEIGH M. WILLIAMS, ESQ.
Attorney for J. David Spurlock and Vanguard Productions, LLC